UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RANDALL PIERCE and REBECCA NIEDERSTADT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HEATH CONSULTANTS INCORPORATED, a foreign corporation,<br><br>Defendant. | Case No. C10-585Z<br><br>ORDER |

THIS MATTER comes before the Court on a motion for summary judgment, docket no. 53, brought by defendant Heath Consultants Incorporated ("Heath"), and a motion for class certification, docket no. 46, brought by plaintiffs Randall Pierce and Rebecca Niederstadt, as putative class representatives. In this action, plaintiffs assert three causes of action against Heath, the current or former employer of all putative class members: (i) failure to pay overtime wages in violation of the Washington Minimum Wage Act ("WMWA"); (ii) failure to pay wages in violation of the WMWA; and (iii) willful withholding of wages in violation of

ORDER - 1

RCW Chapter 49.52.[1] Having reviewed all papers filed in support of, and in opposition to, each motion, the Court enters the following Order.

**Background**

Heath is a Delaware corporation with its principal place of business in Houston, Texas. Amended Notice of Removal at ¶ 1 (docket no. 4). Heath provides *inter alia* leak survey and patrolling services for public utilities. *See* Wakefield Dep. at 10:11-15, Ex. 4 to Motion for Summary Judgment (docket no. 53-1). Puget Sound Energy ("PSE") is Heath's primary client in Washington. *Id.* at 10:4.

The proposed class of plaintiffs are or were employed by Heath as field technicians in western Washington, performing most of their work on PSE's natural gas pipelines. The field technicians who provide services for PSE are divided into three crews, namely north, central, and south crews, in accordance with where they reside and typically conduct their work.[2] *Id.* at 11:23-12:4; Niederstadt Dep. at 112:24-113:9, Ex. 3 to Motion for Summary Judgment (docket no. 53-1).

The normal shift for these field technicians is from 7:00 a.m. until 3:30 p.m., with a half-hour break for lunch. Pierce Dep. at 78:25-79:6, Ex. 2 to Motion for Summary Judgment (docket no. 53-1). Each workday morning, all crew members meet at a designated location. *See* Wakefield Dep. at 91:22-92:19. During the period preceding January 2010, the north crew convened in the covered parking area at the Safeway store on NE 75th Street in Seattle, the

---

[1] Subject-matter jurisdiction is premised on diversity of citizenship, with at least one named plaintiff (Randall Pierce) claiming unpaid wages, exemplary double damages, and attorney fees in an aggregate amount exceeding $75,000. *See* Minute Order (docket no. 39).

[2] Steve Mitchell is the north crew leader, Jeff Eaton is the central crew leader, and John Doudna is the south crew leader. Wakefield Dep. at 11:6-11 & 11:23-12:1. All three crew leaders report to team leader Daniel Wakefield, who is supervised by project manager Gretchen Cairns. *Id.* at 10:19-11:3. Ms. Cairns oversees all work done by Heath employees in Washington. Cairns Dep. at 19:20-22, Ex. 5 to Motion for Summary Judgment (docket no. 53-1).

central crew gathered at Southcenter Mall, and the south crew met at the PSE parking lot in Tacoma. *Id.* at 93:7-20. During these morning meetings, crew members received their assignments for the day in the form of maps indicating the areas to be surveyed. *Id.* at 90:20-91:7. If any questions arose concerning how best to drive to the assigned locations, the crew leader or team leader would offer assistance, consulting the "*Thomas Guide*" that each crew member had been supplied. *Id.* at 91:8-17. On Mondays, the meetings also involved vehicle inspections. *Id.* at 90:5-19; Niederstadt Dep. at 148:1-20.

On Friday afternoons, crew members were required to regroup at the designated location before 3:30 p.m. to meet with the crew leader and submit certain paperwork. Pierce Dep. at 94:12-96:24. Crew members usually arrived early for these Friday meetings. *Id.* at 95:24-96:6. As crew members began congregating, they could finish their paperwork or have it reviewed by the crew leader, but no one left the designated site until 3:30 p.m., when they were released to go home. *Id.* at 95:24-96:24.

Prior to January 2010, crew members had three transportation options: (i) they could use their personal vehicles throughout the work day; (ii) they could drive their personal vehicles to and from home, but use a company vehicle to travel between work sites; or (iii) they could use a company vehicle to drive to, from, and between work sites. *See* Pierce Dep. at 36:23-38:4; Niederstadt Dep. at 55:13-56:3, 56:11-57:7. Use of a company vehicle was optional, and Heath's trucks had no unique or special features that were required for the type of work being performed by the field technicians. Pierce Dep. at 37:15-24. *But see* Niederstadt Dep. at 46:14-17 (indicating that one piece of required equipment, a plunger bar, was longer than the width of a standard automobile).

This lawsuit involves only the third category of field technicians, namely those who opted to use a company vehicle to travel to and from home and between work sites. The complaint alleges that the time spent driving the company vehicle to and from home was compensable under state law and that Heath has violated state law by failing to pay field technicians for such

ORDER - 3

travel time.  The complaint makes no such claim under federal law because the Portal-to-Portal Act relieves employers from any liability under the Fair Labor Standards Act for failure to pay minimum wages or overtime compensation for travel time, which is explicitly defined as including travel via an employer's vehicle for normal commuting.  <u>See</u> 29 U.S.C. § 254(a).

This case was initiated in King County Superior Court on March 5, 2010, and was timely removed to this Court by Heath.  <u>See</u> Order Setting Civil Case Schedule, Ex. A to Notice of Removal (Verification of State Court Records) (docket no. 2 at 16); Notice of Removal (docket no. 1).  Sometime shortly before the commencement of this action, Heath changed its policy concerning field technician use of a company vehicle.  In late 2009 or early 2010, Heath leased offices for the north, central, and south crews, where the company trucks could be parked overnight.  Cairns Dep. at 50:12-51:24.  From that point forward, crew members were required to drive their personal vehicles between their homes and the respective Heath locations to which they were assigned.  They continued to meet every morning as before, but instead of being released directly from the job site at 3:30 p.m., they had to return the company trucks to the Heath facility before 3:30 p.m.  As a result, on every day except Friday, field technicians now spend less time in the field than they did before the policy change.  They are still, however, paid for the same number of hours, namely from 7:00 a.m. until 3:30 p.m., minus the half-hour lunch break.

Both before and after the policy change, Heath placed certain restrictions on an employee's use of a company vehicle.  Absent pre-approval or an emergency, field technicians are not permitted to use company trucks for personal reasons, and may not transport anyone other than authorized personnel.  Cairns Dep. at 90:13-91:18; <u>see</u> Niederstadt Dep. at 91:23-92:5 (indicating that she received permission to drive a company vehicle to early morning medical appointments); Vehicle Safety Policy at § IV.9, Ex. 8 to Berger Decl. (docket no. 57).  Crew members are not allowed to smoke in company trucks, but they can consume food and beverages in the vehicles, listen to the radio or compact disc player while en route, and drive to nearby

ORDER - 4

restaurants or stores on lunch or other breaks to obtain items to consume or to use a restroom. Niederstadt Dep. at 116:8-25, 156:11-20, 157:18-19, 159:8-160:2; Pierce Dep. at 128:9-10, 128:24-129:1, 129:20-130:11; Vehicle Safety Policy at § IV.13.

Heath pays for the business-related operating costs of company vehicles, including fuel and maintenance expenses. Vehicle Safety Policy at § IV.5; Pierce Dep. at 131:15-16; *see* Niederstadt Dep. at 53:18-25 (indicating that driving a company truck between home and work sites was a financial benefit because Heath paid for the gasoline). Field technicians who, prior to January 2010, drove company vehicles between their homes and work sites were taxed on the value of the commuting trips, which was $1.50 per trip or $15 per week. Company Vehicle Use Release Agreement, Ex. 9 to Berger Decl. (docket no. 57).

Heath has a strict policy against overtime, requiring that employees seek approval before engaging in overtime work. Pierce Dep. at 83:4-10; Niederstadt Dep. at 122:5-123:3 (indicating that, on two occasions, she was not paid for overtime work and was reprimanded because she did not obtain prior authorization). All paperwork must be completed during the work day. Wakefield Dep. at 100:16-101:3; Pierce Dep. at 92:6-8. It need not, however, be done inside or near a company vehicle. Wakefield Dep. at 100:5-11. *But see* Niderstadt Dep. at 114:4-115:2 (indicating that Gretchen Cairns had instructed employees against completing paperwork on park benches or at McDonald's or Starbucks).

During the period at issue in this case, crew members were required to be available by cellular telephone during the work day, *i.e.*, between 7:00 a.m. and 3:30 p.m., but not before or after their shifts or while commuting between their homes and work sites. Niederstadt Dep. at 99:3-9; Wakefield Dep. at 110:16-111:24. Although some crew members might have received calls after 3:30 p.m., during their commute home, asking them to work overtime, they were not required to answer these calls and could decline the assignment. Wakefield Dep. at 112:16-24 ("After hours is strictly voluntary." If someone didn't answer, he would "[g]o to the next name" on the list.); Niederstadt Dep. at 103:11-21. If a field technician responded to a "call out," he or

ORDER - 5

1 she would be paid from the time of the call until the job was completed and he or she arrived
2 home. Pierce Dep. at 140:6-12, 140:24-141:7; *see also* Mitchell Aff. at ¶ 5, Ex. 7 to Motion for
3 Summary Judgment (docket no. 53-1) (describing "door to door" payment). No claim is being
4 made in this case concerning compensation for "call outs."

5 Before Heath leased facilities where company trucks could be parked overnight and
6 changed its vehicle policy, crew members who drove company vehicles home were required
7 each evening to remove two pieces of equipment from the trucks, a combustible gas indicator
8 ("CGI") and a flame ionization unit ("FI," "Detecto-Pak 4," or "DP-4"); both items had to be
9 stored in a warm, dry location, and the FI / DP-4 had to be recharged by plugging it into an
10 electrical outlet. Wakefield Dep. at 103:2-6. The time spent on these tasks was minimal, *see*
11 Pierce Dep. at 99:2-18, and plaintiffs do not, in this action, seek compensation for such efforts.
12 Response at 23 (docket no. 56).

13 After the policy change, plaintiff Randall Pierce continued to drive a company vehicle
14 between his home and work sites. Pierce Dep. at 52:17-53:12. Plaintiff Pierce is the only field
15 technician currently allowed to use a company truck to commute to and from his home. *Id.* at
16 53:8-12. He has one of two mobile units, and has voluntarily elected to be available for call
17 outs. Wakefield Dep. at 112:25-113:24; *see* Pierce Dep. at 23:25-24:17 (indicating that only the
18 mobile units are equipped with an ethane kit). As a result, he is more frequently asked to
19 perform "call out" work. Wakefield Dep. at 113:3-5; Pierce Dep. at 112:4-17. These emergency
20 assignments are unpredictable in terms of frequency (*e.g.*, once a month versus three times in a
21 week), and their timing (*e.g.*, day or night) bears no relationship to whether he is in the process
22 of commuting home or is inside his company vehicle. Pierce Dep. at 113:11-114:5; *see id.* at
23 140:14-23 (indicating that receiving a call out while driving home is a rare occurrence); Mitchell
24 Aff. at ¶ 5 ("I was not more or less likely to be called for an emergency if I was in a company
25 truck; it just depends on when the emergency occurs.").

ORDER - 6

1 **Discussion**

2 **A.    Standard for Summary Judgment**

3      The Court shall grant summary judgment if no genuine issue of material fact exists and
4 the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (2010). In
5 support of a motion for summary judgment, the moving party need not negate the opponent's
6 claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); rather, the moving party will be
7 entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the
8 opponent, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When the record taken as
9 a whole, could not lead a rational trier of fact to find for the non-moving party, summary
10 judgment is warranted. *See Beard v. Banks*, 548 U.S. 521, 529 (2006).

11 **B.    Washington Minimum Wage Act**[3]

12      With certain exceptions not relevant to this case, the WMWA specifies a minimum rate of
13 compensation and requires premium pay for overtime work. RCW 49.46.020 & .130. The
14 statute, however, does not provide guidance concerning exactly when an employee is considered
15 to be working for purposes of calculating hourly wages. *See Stevens v. Brink's Home Sec., Inc.*,
16 162 Wn.2d 42, 47, 169 P.3d 473 (2007). Thus, in *Stevens*, in determining whether the plaintiffs,
17 a class of technicians employed by Brink's Home Security, Inc. ("Brink's"), should be
18 compensated for the time they spent driving company trucks between their homes and their job
19 sites, the Washington Supreme Court relied on a regulatory definition promulgated by
20 Washington's Department of Labor and Industries ("L&I"). *Id.* at 47 & n.1. Pursuant to
21 WAC 296-126-002(8), the phrase "hours worked" means "all hours during which the employee
22 is authorized or required by the employer to be on duty on the employer's premises or at a
23 prescribed work place."

---

25 [3] Plaintiffs' claim under RCW Chapter 49.52 for willful withholding of wages is premised on their claim under
the WMWA. If the commuting time at issue is not compensable, then plaintiffs cannot sustain a claim for
wrongful wage withholding. *See* RCW 49.52.050 & .070 (imposing civil liability for twice the amount of wages
26 unlawfully rebated or withheld).

ORDER - 7

Applying this standard, the *Stevens* Court affirmed the trial court's grant of summary judgment in favor of the plaintiffs because the technicians were (i) "on duty" and (ii) "at a prescribed work place" during their travels. In reaching this conclusion, the Supreme Court distinguished a previous Court of Appeals decision holding that state employees were not entitled to compensation for the time they spent on the employer-provided ferry to and from the Special Commitment Center ("SCC") on McNeil Island. *Anderson v. Dep't of Soc. & Health Servs.*, 115 Wn. App. 452, 63 P.3d 134 (2003). The SCC employees were deemed not "on duty" because, during the passage to and from McNeil Island, they could engage in personal activities, such as "reading, conversing, knitting, playing cards, playing hand-held video games, listening to CD [compact disc] players and radios, and napping." *Id.* at 454. During the commute time, SCC employees performed no work. *Id.*

In contrast, the technicians employed by Brink's were viewed as being "on duty" for three reasons. First, their use of company vehicles was strictly controlled. 162 Wn.2d at 48. They could not carry non-Brink's employees as passengers and could not use the trucks for personal errands. Second, the technicians received their daily assignments before leaving home, and were required to spend time at home identifying the appropriate routes to the various jobsites before beginning their initial drives. *Id.* at 48-49. Third, while en route to and from their homes, the Brink's employees were required to remain available and could be redirected to assist with other service calls. *Id.* at 49.

The technicians in *Stevens* were also considered to be "at a prescribed work place" when they were inside their Brink's trucks. The majority in *Stevens* so held because the Brink's trucks carried the tools and equipment necessary for servicing and installing home alarm systems, the technicians reported to the office only once each week to refill supplies and attend a weekly company meeting, the technicians were required to complete all paperwork either at the customer's home or in the Brink's truck, and the technicians were responsible for keeping the vehicles "clean, organized, safe, and serviced." *Id. But see id.* at 53 (Madsen, J., concurring)

ORDER - 8

("[T]he majority's strained analysis shows the difficulty with trying to shoehorn a company truck into a rigid reading of 'employer's premises' or 'prescribed work place.' I am unconvinced by this implausible literal application of the terse phrases in the regulation.").

### 1. **"On Duty"**

Before the Washington Supreme Court decided <u>Stevens</u>, L&I had an administrative policy concerning when travel time constitutes "hours worked" that provided in relevant part:

> Time spent driving from home to the job site, from job site to job site, and from job site to home is considered work time when a vehicle is supplied by an employer for the mutual benefit of the employer and the worker to facilitate progress of the work. All travel that is an integral and indispensable function without which the employee could not perform his/her principal activity, is considered hours worked. Employment begins when the worker enters the vehicle and ends when the worker leaves it on the termination of that worker's labor for that shift.

<u>Stevens</u>, 162 Wn.2d at 54 (Madsen, J., concurring) (quoting L&I Admin. Policy ES.C.2 (Jan. 2, 2002)). After <u>Stevens</u>, L&I amended its administrative policy to separately address the two elements of "hours worked," namely "on duty" and "prescribed work place." With regard to the "on duty" prong, L&I's administrative policy now reads:

> Following is a non-exclusive list of factors to consider when making a determination if an employee is "on duty" [when driving a company-provided vehicle between home and work]. There may be additional relevant factors that the Supreme Court or L&I have not considered. All factors must be considered and weighed in combination with each other. The mere presence or absence of any single factor is not determinative.
>
> 1. The extent to which the employee is free to make personal stops and engage in personal activities during the drive time between home and the first or last job site of the day, or whether the vehicle may only be used for company business.
>
> 2. The extent to which the employee is required to respond to work related calls or to be redirected while en route.
>
> 3. Whether the employee is required to maintain contact with the employer.
>
> 4. The extent to which the employee receives assignments at home and must spend time writing down the assignments and mapping the route to reach the first job site before beginning the drive.

ORDER - 9

L&I Admin. Policy ES.C.2 (Sep. 2, 2008), Ex. 1 to Motion (docket no. 53-1 at 6). The administrative policy, as revised, captures both the holding and tenor of the Supreme Court's decision in *Stevens*, and under this policy, plaintiffs cannot demonstrate any triable issue as to the compensability of their travel time in company vehicles during the time frame at issue in this case.

Plaintiffs attempt to analogize their circumstances prior to January 2010 with the situation of the Brink's employees in *Stevens*. *Stevens* is, however, distinguishable. Unlike in *Stevens*, of the four non-exclusive factors enumerated in L&I's administrative policy for determining when an employee is "on duty" while driving a company vehicle, only one is present in this case. Plaintiffs focus primarily on this one factor, namely Heath's strictly-enforced prohibition on the personal use of company vehicles, and they devote almost no attention to the other three factors. These additional factors, however, cannot be ignored; rather, they demonstrate that plaintiffs were not "on duty" for purposes of the WMWA.

Plaintiffs offer no evidence that "call outs" happened during morning commutes, and they do not dispute that "call outs" during afternoon commutes were "rare" and were assigned on a voluntary basis. If a "call out" did occur while a crew member was en route to his or her home, it did so merely by coincidence, and a "call out" might as predictably have happened during the middle of the night. Moreover, field technicians were not required to maintain contact with their crew leaders or other Heath supervisors while commuting in the morning or afternoon. Thus, both the second and third factors, namely responding to work-related calls while en route and maintaining contact with the employer during the commute, support the conclusion that plaintiffs were not "on duty" during their travels between home and work in company vehicles.

The fourth factor, namely receiving assignments and making preparations at home, even more strongly favors Heath. Unlike Brink's employees, Heath field technicians were not required to take notes of assignments, map routes, or perform work before leaving home or after returning. Inspecting vehicles, refilling fuel canisters, calibrating equipment, and other

ORDER - 10

preparatory activities were performed after 7:00 a.m. and were fully compensated. *See* Pierce Dep. at 72:23-74:6. All paperwork was to be completed during the shift, *i.e.*, before 3:30 p.m., off-the-clock work was prohibited, *see* Exs. 13 & 14 to Motion for Summary Judgment (docket no. 53-1), and overtime was subject to a pre-approval process. Thus, absent a specific overtime assignment, Heath employees were not "on duty" before 7:00 a.m. or after 3:30 p.m., the hours for which they were paid, regardless of whether they drove company trucks or personal vehicles between their homes and work sites.

To the extent plaintiffs are suggesting that the first "control" factor trumps the other three considerations relevant to the "on duty" analysis, their contention lacks merit. Precluding employees from using company vehicles for personal business bears much more of a relationship to the employer's potential liability for driving mishaps than to whether the commuting time constitutes compensable work, and using such "control" as a sole basis for liability under the WMWA runs counter to the holding and tenor of *Stevens*. Prior to *Stevens*, L&I's administrative policy treated all "[t]ime spent driving from home to the job site, from job site to job site, and from job site to home" in an employer's vehicle as "hours worked." The *Stevens* Court moved away from this broad interpretation and narrowed the situations in which an employee's commute in an employer-supplied vehicle qualifies as compensable time. To rely on only the equivocal element of "control" over the permissible uses of a company vehicle would ignore the clear distinction made by the Washington Supreme Court between mere travel to and from work, for which an employee need not be paid, and performing (or being available to perform) services during the commute, for which an employee should be compensated.

In their response to Heath's motion for summary judgment, plaintiffs implicitly acknowledge that, during the period at issue, neither the weekday morning commutes nor the Friday afternoon commutes were compensable. *See* Response at 22-24 (docket no. 56) (suggesting that the Court analyze the morning and afternoon drives separately). In seeking compensation for the evening drives home on Mondays through Thursdays, plaintiffs focus on

ORDER - 11

the "unpredictable and potentially distant work site" locations from which crew members might have had to drive home and the requirement that they, upon arriving home, remove the DP-4s from their vehicles and recharge them. *Id.* at 23. The length of the commutes home, however, might have correlated more closely with traffic conditions and routes chosen than with distances, and such time variations in reaching home, which are faced by all workers who live more than a few blocks from their place of employment, do not alone render the commuting time compensable.[4] Reliance on the DP-4 recharging activities adds nothing. Plaintiffs fail to explain why they should have been paid for the entire ride home rather than the undisputedly *de minimis* amount of time spent plugging the DP-4 into an electric outlet, particularly when such activity required so little effort that plaintiffs do not even seek compensation for it in this action.

With regard to the afternoon commutes, plaintiffs complain about the benefits that Heath derived from the previous policy when compared with the current one. Under the old regime, Heath did not have to lease any facilities because the company vehicles were parked, and the DP-4s were charged, overnight at field technicians' homes. That Heath might have saved on overhead, however, does not transform mere commuting into compensable work. Crew members also reaped benefits from the use of company trucks in the form of fuel and vehicle maintenance savings in connection with their travels between home and work. Although taxed on such benefits, they were not required to reimburse Heath for such expenses. Whether the amount saved by not leasing facilities was offset by the expenditure for extra fuel remains unclear, but even if Heath did benefit from the prior system, it did not do so at its employees' expense. No allegation has been made that field technicians incurred parking or other unreimbursed costs as a result of driving their company vehicles home each evening. In sum,

---

[4] Indeed, any argument that Heath extracted more billable work from employees under the previous system, when field technicians were released at 3:30 p.m. from the field, than under the current policy, pursuant to which crew members must return each afternoon to the Heath facility, belies rather than supports the contention that employees were "on duty" while commuting home. Such assertion acknowledges that the travel time from the last job site to the Heath facility does not entail substantive work or services contributing to Heath's "bottom line," and the same conclusion must be drawn as to the afternoon commutes home under the earlier program.

ORDER - 12

1 plaintiffs' suggestion that the morning and afternoon commutes were different in nature, and that
2 even if the former were not compensable, the latter should be treated as "on duty" time, lacks
3 merit, and Heath did not violate the WMWA by not paying for normal travel time between home
4 and work sites.

### 2. "Prescribed Work Place"

With regard to the second element of "hours worked," namely "prescribed work place,"
L&I's current (post-*Stevens*) policy provides:

> Following is a non-exclusive list of factors to consider when making a
> determination if any employee is "on the employer's premises or at a prescribed
> work place" [when driving a company-provided vehicle between home and
> work]. . . .
>
> 1. Whether the nature of the business requires the employee to drive a
>    particular vehicle provided by the employer to carry necessary nonpersonal
>    tools and equipment to the work site.
>
> 2. The extent to which the company-provided vehicle serves as a location
>    where the employer authorizes or requires the employee to complete
>    business required paperwork or load materials or equipment.
>
> 3. The extent to which the employer requires the employee to ensure that the
>    vehicle is kept clean, organized, safe, and serviced.

L&I Admin. Policy ES.C.2 (Sep. 2, 2008), Ex. 1 to Motion (docket no. 53-1 at 6-7). Because
field technicians were not "on duty" during their commutes in company trucks, the Court need
not address and does not decide whether the vehicles were a "prescribed work place."[5]

---

[5] The issue appears to involve questions of fact. With regard to the first factor in L&I's administrative policy, the parties dispute whether the nature of Heath's business required employees to drive company vehicles. Although ample evidence supports the conclusion that no particular type of truck was needed, and that field technicians were permitted to use their personal vehicles for work purposes, plaintiff Niederstadt testified that a necessary tool (a plunger bar) was longer than the width of a standard vehicle, implying that a company truck was required to perform the work of a field technician. As to the second factor, namely the extent to which the company vehicle served as an authorized or required location for completing paperwork, plaintiff Niederstadt's deposition likewise presents an issue of fact. Although plaintiffs point to no written policy requiring paperwork to be performed in company vehicles, and Heath denies such policy exists, plaintiff Niederstadt testified she had been told by Gretchen Cairns that field technicians needed to remain near their company trucks and could not do their paperwork at McDonald's, Starbucks, or similar locations.

ORDER - 13

**Conclusion**

For the foregoing reasons, the Court GRANTS Heath's motion for summary judgment, docket no. 53, on the ground that plaintiffs cannot, as a matter of law, satisfy the first "on duty" element of "hours worked." The Court STRIKES as moot plaintiffs' motion for class certification, docket no. 46, and DISMISSES this case with prejudice. The Clerk is DIRECTED to enter judgment in favor of defendant Heath Consultants Incorporated, to send copies of this Order to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

DATED this 27th day of June, 2011.

Thomas S. Zilly
United States District Judge